INMATES OF THE SUFFOLK COUNTY
JAIL, et al., Plaintiffs,

v.

SHERIFF OF SUFFOLK COUNTY,
et al., Defendants.

Civil Action No. 71–162–REK.

United States District Court,
D. Massachusetts.

Jan. 2, 1997.

Max D. Stern, Lynn G. Weissberg, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Julio Gonzalez, Carlos Manuel Lopez, Stephen Gordon, Rogelio Santiago and Inmates of Suffolk County Jail.

Chester A. Janiak, Burns & Levinson, Boston, MA, Douglas Wilkins, Attorney General's Office, Boston, MA, for Commissioner of Corrections.

Thomas O. Bean, Attorney General's Office, Boston, MA, for Commonwealth of Massachusetts.

Chester A. Janiak, Paul E. Stanzler, Holly A. Ditchfield, Burns & Levinson, Boston, MA, for Robert Rufo.

Augustus J. Camelio, AFSCME · Council 93, AFL-CIO Boston, MA, for American Federation of State, County, and Municipal Employees Council 93, AFL-CIO.

## Opinion

KEETON, District Judge.

Pending before the court are the following motions:

(1) Motion of the Sheriff of Suffolk County to Terminate All Prospective Relief Within the Meaning of and Pursuant to 18 U.S.C. § 3626(b)(2) (Docket No. 375, filed June 14, 1996); and

(2) Defendant Commissioner of Correction's Motion to Vacate Consent Decree (Docket No. 378, filed June 24, 1996).

Plaintiffs oppose both motions. The United States of America has intervened and filed a Memorandum of Law of the United States of America with Respect to the Constitutionality of Certain Provisions of the Prison Litigation Reform Act (Docket No. 398, filed September 26, 1996).

The motions are allowed in part and denied in part.

## I. Procedural Background Preceding the Prison Litigation Reform Act

The procedural history of this twenty-five-year-old litigation is well documented in many of this and other courts' opinions, most recently in this court's Memoranda and Orders of March 31, 1993, January 25, 1994 and June 14, 1994. This opinion recites only briefly the procedural history and focuses primarily on the most relevant parts of the modified Consent Decree that is the subject of the pending motions.

The plaintiff class, all pretrial detainees being held in the Suffolk County Jail, brought suit against the defendants in 1971, challenging as unconstitutional the conditions of their confinement. At the time, Suffolk County pretrial detainees were held at the Charles Street Jail, which was built in 1848. Although invoking numerous problems with the aging facilities, the plaintiffs' lawsuit focused especially on the defendants' practice of "double-bunking" inmates in cells designed to hold only one person. In 1973, then presiding Judge Garrity found that the condi-

tions at the Charles Street Jail violated the constitutional rights of the plaintiffs, ordered a permanent injunction against double-bunking at the jail, and set a date after which no pretrial detainees could be held at the Charles Street Jail.

After years of substantive and procedural conflict, the parties entered into the Consent Decree on May 7, 1979. The decree was modified on April 11, 1985, April 22, 1985, August 30, 1990, and June 14, 1994. Key provisions of the Consent Decree, as modified, are set forth here.

**May 7, 1979 Consent Decree.** Following introductory paragraphs in which the defendants expressed their desire to "fulfill their duties under state and federal law to provide, maintain and operate as applicable a suitable and constitutional jail for Suffolk County pretrial detainees" and the plaintiffs expressed their desire that they "not be exposed to unconstitutional conditions of pretrial confinement," the document declared:

> And whereas all parties desire to avoid further litigation on the issue of what shall be built and what standards shall be applied to construction and design [of the new jail];

> And whereas all parties agree that for the purposes of this litigation the Suffolk County Detention Center, Charles Street Facility, Architectural Program which is attached and, as modified . . . below, incorporated in this decree, sets forth a program which is both constitutionally adequate and constitutionally required.

**April 11, 1985 Order Modifying Decree.** Having recognized the changed circumstance of an unforeseen magnitude of increase in the jail population, the court in this order granted the plaintiffs' motion to modify the Consent Decree in the following way:

> It is therefore ordered, adjudged and decreed that the Consent Decree be modified as follows:

> Nothing contained in the Consent Decree, however, shall prevent the defendants from increasing the capacity of the new facility if the following conditions are satisfied:

> (a) single-cell occupancy is maintained under the design for the facility; [and]

> (b) under the standards and specifications of the Architectural Program, as modified, the relative proportion of cell space to support services will remain the same as it was in the Architectural Program; . . . .

**August 30, 1990 Order.** As the court recognized in its June 14, 1994, Final Order, this Order modified the Consent Decree to the following extent:

> 1. Plaintiffs' Motion for Order to Transfer Female Detainees to Nashua Street Jail is allowed.

> 2. The Sheriff of Suffolk County and the Commissioner of Correction shall transfer all Suffolk County female pre-trial detainees currently held at MCI–Framingham to the Suffolk County Jail at Nashua Street.

> 3. This Order does not prevent the Sheriff from reallocating space within the new facility, as long as the following conditions are satisfied:

> (a) The Sheriff of Suffolk County shall not house more than one detainee in a cell at the new facility.

> (b) The relative proportion of the cell space to support services remains the same as in the Architectural Program attached to the Consent Decree.

> (c) The Sheriff of Suffolk County shall not transfer from the Nashua Street Jail female detainees to other institutions unless more than forty female detainees are committed to his custody, in which event he is not prevented from transferring the number of female detainees necessary to reduce the number of female detainees in the new facility to forty.

**June 14, 1994 Final Order.** The Final Order modified the Consent Decree as follows:

> (1) The Consent Decree of May 7, 1979 (as modified by the orders of April 11, 1985, April 22, 1985, and August 30, 1990) is further modified to the extent that, and only to the extent that, as long as no inmates other than Suffolk County pretrial

detainees are assigned to the Nashua Street facility, the Sheriff

(a) may alter up to 100 cells to permit double occupancy, and

(b) may, at any given time, place two inmates in each of the altered cells to the extent necessary to have space within the Nashua Street facility for all Suffolk County pretrial detainees committed to the Sheriff's care.

In the Final Order, the court also "permitted" the Sheriff to act in accordance with an agreement between the parties. In pertinent part, the agreement forbade the use of the "House of Detention" or the "City Prison" in the Suffolk County Courthouse to house pretrial detainees, and required the Sheriff to report the need, in the case of an emergency, to use any facility other than the Nashua Street Jail to house the plaintiff inmates.

The agreement allowed the Sheriff to hold female members of the plaintiff class at the Suffolk County House of Correction, with a cap on the number of female detainees that could be held there and a limit on the number of cells in which the female detainees could be double-bunked. Under this part of the agreement, any cells made available by the transfer of female detainees from the Nashua Street Jail were to be used for single-cell occupancy by male inmates.

Finally, the June 14, 1994 Final Order contained the following directives regarding the eventual closing of the case:

(3) This civil action, though not finally closed as of entry of this order, remains open for limited purposes only. The court will hear a motion by any party for further proceedings upon a showing of good cause, for example, upon a prima facie showing of noncompliance with the court's order, or upon a showing of material change in circumstances after the date of entry of this order.

(4) On a date five years from entry of this order, the case will be finally closed unless on appropriate motion and for good cause shown the court orders an earlier or later closing date. After the case is finally closed, no further supervision by this court will occur, and no further motion for modification of the consent decree will be entertained by the court, unless an appropriate motion to reopen, meeting the criteria applicable to relief from a final judgment, has first been allowed.

On the same date as the Final Order, the court also entered a Separate Order for Reporting, ordering the Sheriff to report every six months from the date of the entry of the Order on the number of violent and sexual assaults at the Nashua Street Jail and the incidence of tuberculosis among inmates detained there. The responsibility for reporting would end with the closing of the case in 1999.

## II. Pertinent Provisions of the Prison Litigation Reform Act

Exactly two years after the June 14, 1994 Final Order, the Sheriff filed the present motion. The Sheriff bases his motion on the provisions in the recently passed Prison Litigation Reform Act, Pub.L. 104–134, §§ 801, 802 (1996) (amending 18 U.S.C. § 3626) ("PLRA"), governing remedies in prison-conditions litigation.

Under § 3626(a), as amended by the PLRA, a district court must make specific findings on designated subjects before it can grant "prospective relief" in a civil action involving prison conditions. Specifically, a court "shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Subsection (c) states that the requirement of findings applies as well to judicial approval of consent decrees.

The PLRA also provides for termination of prospective relief in cases where such relief has been granted without the court's having made the requisite findings. Upon motion to the court, a defendant or intervenor is entitled to "immediate termination of prospective relief" in cases where a court has granted such relief without making the requisite findings. 18 U.S.C. § 3626(b)(2). Prospective relief may continue, however, if the court "makes written

findings based on the record that prospective relief remains necessary to correct a current or ongoing violation of the Federal right, extends no further than necessary to correct the violation of the federal right, and that the prospective relief is narrowly drawn and the least intrusive means to correct the violation." *Id.* Thus, termination of an order for prospective relief may be avoided if the district court determines that it has already made, or has a basis for making, and does make, the findings that the prospective relief is tailored to be the least intrusive means to correct the violation of the federal right.

Subsection (g) of § 3626 provides specific definitions for the terms of the statute. In pertinent part, the statute defines "prospective relief" as "all relief other than compensatory monetary damages," and defines "relief" as "all relief in any form that may be granted or approved by the court, and includes consent decrees but does not include private settlement agreements." 18 U.S.C. § 3626(g)(7) and (9). The term "consent decree" is defined as "any relief entered by the court that is based in whole or in part upon the consent or acquiescence of the parties but does not include private settlements." *Id.* at § 3626(g)(1).

The statute contains an automatic stay provision, authorizing a court to stay all prospective relief pending the court's decision on a motion to terminate all prospective relief, beginning 30 days from the filing of such a motion. The parties in this case, however, have agreed to waive this provision in order to allow time for their submissions, and the court's consideration of them, before the court rules. In these circumstances, I conclude that the 30–day automatic stay provision and potential challenges to its constitutionality are not at issue in this case.

### III. Primary and Alternative Positions of the Parties

Defendants argue that under the terms of the PLRA, which apply to "all prospective relief whether such relief was originally granted or approved before ... the date of enactment of this title," 18 U.S.C. § 3626(b)(2)(iii), the court should immediately terminate all prospective relief entered in this case. Defendants contend that the court's previous decisions do not make the findings required under § 3626(a), and that there is no showing of a current or ongoing constitutional violation at the Nashua Street Jail that would support the court's making these findings now under § 3626(b). Citing numerous affidavits filed along with their motions, as well as the bi-annual reports made by the Sheriff under the Separate Reporting Order, defendants allege that the reports show that the double-bunking allowed by the Final Order of June 14, 1994, has not resulted in any increase in violence or disease among the inmate population. Therefore, defendants argue, there is no evidence that would support a finding that prospective relief is still warranted under the terms of the PLRA.

The Sheriff asks the court to "vacate" the Consent Decree and Final Order "insofar as either provides prospective relief for alleged conditions of overcrowding" (Revised Memorandum in Support of the Sheriff of Suffolk County's Motion to Terminate All Prospective Relief Within the Meaning of and Pursuant to 18 U.S.C. § 3626(b)(2)). The Commissioner joins the Sheriff in this contention, and argues further that the Consent Decree in its entirety constitutes prospective relief as defined by the PLRA. The Commissioner argues that vacating the decree is also warranted under Fed.R.Civ.P. 60(b), based on the changed circumstances evidenced by the affidavits and reports filed with the court after issuance of the Final Order in June, 1994, as well as the change in circumstance wrought by the PLRA itself.

Plaintiffs attack the defendants' motion on both non-constitutional and constitutional grounds. In order to avoid addressing the serious constitutional problems posed by the PLRA, plaintiffs contend, the court should determine that the findings and conclusions contained in its previous decisions are sufficient to satisfy the findings requirement of § 3626(a). In the alternative, they ask the court to make now the findings required by § 3626(b)(2). If these findings cannot be made, plaintiffs argue that the court must reach and rule upon their challenges to the statute's constitutionality.

According to the plaintiffs, the PLRA violates a number of constitutional provisions. Plaintiffs argue that the PLRA is unconstitutional because it violates the separation of powers doctrine in that the statute reopens a final judgment in violation of the principles most recently articulated in *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995); prescribes a rule of decision for the judiciary, a power that is forbidden to Congress under the decision of *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871); and impermissibly restricts the ability of the judiciary to remedy constitutional violations. In addition to invoking the independence of the American judiciary in our constitutional system, plaintiffs' separation of powers arguments rest primarily on the contention that the Consent Decree is a final judgment, and that Congress cannot interfere with a final judgment unless it changes the underlying substantive law and does so in circumstances in which retroactive substantive change is constitutionally permissible. Plaintiffs also invoke a number of other constitutional doctrines, arguing that application of the termination provisions of the PLRA would violate the Due Process Clause of the Fifth Amendment, unconstitutionally impair the plaintiffs' contract with the defendants, and deny to plaintiffs the equal protection of the laws.

Not surprisingly, defendants disagree with plaintiffs' assessment of the constitutionality of the PLRA. Defendants argue that the Consent Decree is not a final judgment because the court still maintains jurisdiction over the case, and because the relief authorized by the Consent Decree is subject to equitable modification based on changed circumstances. Citing *Pennsylvania v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1855), defendants argue that prospective relief of the type granted in this case is fundamentally different from monetary relief, and that the principles of *Plaut* do not apply. Defendants also argue that the PLRA does change the substantive law by defining a remedial standard to be applied by the courts in formulating relief. Instead of prescribing a rule of decision, defendants argue, the PLRA constitutes a legitimate act of Congress well within the constitutionally granted authority of Congress (when acting with the assent of the President) to define the jurisdiction of Article III courts other than the Supreme Court.

For its part, the United States defends the constitutionality of the PLRA, echoing and elaborating upon the arguments set forth by defendants. The United States acknowledges that an extreme reading of the PLRA might raise very serious constitutional problems, but argues that the court should read the statute in a way that avoids these problems. In particular, the United States urges a less stringent and restrictive interpretation of what satisfies the requirement that the district court find a "current and ongoing violation of the Federal right," as that phrase is used in § 3626(b)(2). According to the government, this finding would be permissible where the "proximate effects" of a past constitutional violation have not yet been remedied, as well as where an imminent threat of recurrence of a violation of federal rights exists.

## IV. Should the Court Reach Issues Regarding the Constitutionality of the PLRA in Deciding the Motions Now Before the Court?

### A. The Desire of All Parties for Immediate Decisions on Constitutionality

All parties appearing and filing submissions before the court on the pending motions have expressed agreement that the court should, perhaps even must, decide forthwith, on the merits, plaintiffs' challenge to the constitutionality of the PLRA. The appearance of agreement is illusory, however, because each party is asserting that the constitutional challenge should be decided immediately *in its favor*.

At a hearing on November 27, 1996, the court called attention to the fact that some of the submissions described the defense motions now pending as requests "to terminate all prospective relief," but that one submission in particular, that of the Commissioner, described the defense motions as requests "to vacate the consent decree." The court observed, however, that ordinarily a sharp contrast exists between vacating a judgment (or decree) and merely modifying it by termi-

nating one or more of its provisions regarding relief for a breach of duty or violation of a right. The court further suggested that interpreting the PLRA to require only termination of any *prospective relief* contained in the Consent Decree, instead of vacating the entire decree (including the adjudications contained therein), would avoid constitutional problems.

The court then inquired, "Is there a material difference between terminating some provisions and vacating the entire decree in this case?" A surface appearance of agreement among the parties might be inferred from the unwillingness of any party to argue for an affirmative answer to this question. Deeper probing, however, suggests that the more likely explanation is again the understandable desire of each party to have all constitutional challenges decided immediately *in its favor*, and the understandable views of all counsel that they best serve their respective clients' interests by taking this position.

Defendants, for example, pointing to the definition of "prospective relief" set forth in the PLRA ("'prospective relief' means all relief other than compensatory monetary damages"), argue that terminating such relief would require vacating the Consent Decree, because, in the words of the submission on behalf of the Commissioner, "[i]n entering the decree, the Court itself makes no adjudication beyond approval of the decree" (Supplemental Memorandum of the Commissioner in Support of His Motion to Vacate the Consent Decree, at 5).

After taking an opportunity for reflection offered by the court at the hearing of November 27, 1996, plaintiffs informed the court in a later submission that, in their view, because terminating all prospective relief would be interpreted by defendants as ending the defendants' obligation to maintain single-cell occupancy, a court order terminating all prospective relief will as a practical matter cause plaintiffs to lose "rights secured to them by the decree." Therefore, plaintiffs argue, the court must either make the findings required by the statute and order that narrowly tailored prospective relief remains in effect or confront the constitutional issues posed by the PLRA.

The attorney for the United States, as intervenor, stated that "all prospective relief" appears to encompass the entire Consent Decree, and has suggested that any declaratory relief is included within the meaning of prospective relief; the government, however, has declined to take a position on whether the court should vacate the decree in ruling on the motions now pending.

## B. Elements of Judgments, Decrees, Consent Decrees, and Orders in Aid of Enforcement

In paradigm tort and contract cases brought by two or more plaintiffs, judgment for plaintiffs is simply an award of money damages, with costs, and prejudgment and post-judgment interest in appropriate cases (though ordinarily not when the only defendant is a government entity that is immune from an award of interest). If the judgment is not satisfied, orders in aid of enforcement (such as attachments, garnishment, or orders for discovery aimed at identifying non-exempt assets) are made not as a part of the judgment or as a modification of it but as separate orders. The judgment remains intact, even if not satisfied before a time limit bars enforcement proceedings. Even after enforcement proceedings are barred, the judgment may have significant consequences, through claim preclusion, issue preclusion, and in other ways.

In the exceptional breach-of-contract case in which specific performance (a form of prospective relief) is decreed, a later modification of the decree terminating the order of specific performance would by no means be equal to vacating the decree. The adjudication of breach would remain in force, absent an explicit order vacating the decree rather than just modifying it by terminating the provisions for specific performance.

Thus, defendants' argument that the PLRA's prescription for terminating prospective relief is equivalent to a prescription for vacating any consent decree containing a provision for prospective relief is without support in the large body of precedent that was part of the historical context in which the PLRA was enacted. To read the statute

as the defendants would have the court read it would require a finding that Congress acted without consideration for, or in abrogation of, this body of precedent, and would raise troubling questions of the statute's constitutionality.

## C. Should Constitutional Challenges to the PLRA Be Decided in Ruling on Motions Pending in this Case?

■ Courts must examine the text of the relevant provisions of the PLRA to determine their meaning as bearing on the relationship between terminating prospective relief and vacating a consent decree. Before turning to that task, a court may appropriately, and perhaps even must, take note of precedents bearing upon justiciability and prudential constraints against prematurely addressing constitutional issues that may be mooted by an interpretation of the statute that is at least one of the possible interpretations likely to be adopted by higher courts (in this instance, by the Court of Appeals for the First Circuit or the Supreme Court).

■ When two or more equally plausible interpretations of statutory text are advanced by the parties to a case and one of the clashing interpretations presents serious constitutional problems, a trial court should adopt the interpretation that avoids constitutional issues unless a contrary manifestation of Congressional intent appears elsewhere in the context of the legislation. *See DeBartolo v. Florida Gulf Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397, 99 L.Ed.2d 645 (1988). As the Supreme Court stated in *DeBartolo:*

> This approach not only reflects the prudential concern that constitutional issues not be needlessly confronted, but also recognizes that Congress, like this Court, is bound by and swears an oath to uphold the Constitution. The courts will therefore not lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it.

*Id.* at 575, 108 S.Ct. at 1397 (citation omitted).

■ Applying this basic principle of constitutional adjudication, I conclude that construing the language "termination of all prospective relief" as requiring that the entire Consent Decree in this case and every adjudication within it be *vacated* would raise very serious constitutional problems indeed. A confirmation that serious and divisive constitutional problems would be presented by this interpretation appears in a split that has already developed regarding the constitutionality of several provisions of the PLRA. *Compare Plyler v. Moore,* 100 F.3d 365 (4th Cir.1996) (upholding the termination provisions of the PLRA against constitutional challenge), *and Benjamin v. Jacobson,* 935 F.Supp. 332 (S.D.N.Y.1996) (same), *with Hadix v. Johnson,* 933 F.Supp. 1362 (W.D.Mich. 1996) (holding that automatic stay provision of the PLRA violated separation of powers principle), *and Gavin v. Ray,* 1996 WL 622556 (S.D.Iowa Sept. 18, 1996) (applying reasoning of *Hadix* to provision in PLRA authorizing termination of all prospective relief). Other courts, however, have construed the language of the PLRA in such a way as to avoid addressing possible constitutional problems. *See Coleman v. Wilson,* 933 F.Supp. 954, 957 n. 7 (E.D.Ca.1996); *Madrid v. Gomez,* 940 F.Supp. 247, 254 n. 12 (N.D.Ca.1996).

I conclude that an alternative and entirely reasonable interpretation of the meaning of "termination of all prospective relief" avoids a conflict between the statute and a constitutional principle of separation of powers.

## D. Meaning of "Prospective Relief"

■ To determine whether the PLRA should itself be interpreted as using the phrase "termination of prospective relief" as equivalent to "vacating" any consent decree containing prospective relief as one of its elements, courts are directed by precedent to first examine the text of the statute itself. *Cf., e.g., Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301, 85 L.Ed.2d 692 (1985). Moreover, a general guideline of statutory interpretation is that statutory terms must be read in the context of the entire act and in relation to each other. *See, e.g., King v. St. Vincent's Hospital,* 502

U.S. 215, 221, 112 S.Ct. 570, 574, 116 L.Ed.2d 578 (1991).

A key element of the manifestation of Congressional intent in this case is found in the statute's repeated and manifestly purposeful use of the word "prospective." That "prospective relief" has a more specific meaning than "judgment" or "decree" is suggested by the presence of separate definitions in the PLRA for the term "prospective relief" and for its root element, "relief." *See* § 3626(g)(7) and (9)

One may hesitate about accepting the inference that the distinction between "judgment" and "prospective relief" is made in the statute, however, because of the statutory definition of "prospective relief" as "all relief other than compensatory damages." 18 U.S.C. § 3626(g)(7). Two points join to overcome this hesitation.

First, a "judgment" or "decree" consists of more than just a declaration of "relief," in money damages or in some other form. It includes also an adjudication of a breach of some legally recognized duty or violation of some legally protected right, or a consent or agreement in lieu of litigating all the way to an adjudication.

Second, when a modified judgment or decree memorializes something already done before the date of final modification, one would not ordinarily think of that formal memorialization as "relief." It was, instead, a prelude to the relief, and ordinarily an essential adjudication or a consent that made adjudication unnecessary. Thus, the "judgment" or "decree" consists of more than just orders of "relief."

Lawmaking cannot erase the reality of this distinction. The most that lawmaking can do is to declare the distinction immaterial to outcome in a particular context. And if a statute is interpreted as declaring this distinction immaterial to whether a previously entered consent decree is to be vacated, a serious issue of constitutionality is presented.

Despite the reality that this distinction exists, regardless of what a particular law says about its legal effect, the statutory definition of "consent decree" in the PLRA, at first blush, might be thought to favor the contention that terminating "prospective relief" requires vacating the entire "judgment" or "decree" of the court. The statutory definition of "consent decree" is "all relief in any form that may be granted or approved by the court...." § 3626(g)(1).

Closer examination of the entire text of the statute, however, rebuts this interpretation. One reason is that this interpretation is hard to square with the phrase that follows in the definition of consent decree: "but *does not include private settlement agreements." Id.* (emphasis added). The force of this point is limited, however, by the definition of "private settlement agreement" as meaning "an agreement entered into among the parties that is not subject to judicial enforcement other than the reinstatement of the civil proceeding that the agreement settled." 18 U.S.C. § 3626(g)(6).

Of greater force as bearing on this issue of statutory interpretation is the point stated above that ordinarily a "judgment" or "decree" that is in the form of a "consent decree" is still an adjudication of an ongoing obligation based on a claim of "violation of a Federal right" that was at least one part of the subject matter of the civil action in which the Consent Decree was entered. That adjudication may still have pragmatic consequences even after the prospective relief that had earlier been included in the Consent Decree has been terminated. Those consequences might include an entitlement to an award of monetary relief even if specific performance is not available. Also, an adjudication of a past violation of a federal right might still have significant practical consequences in other ways. Not the least of these ways is that officials of other branches of government ordinarily respect and abide by adjudications of a court, even when they question the power or authority of the court to specifically enforce its orders and even while officially asking the court or a higher court to modify or vacate its adjudications.

■ I need not and do not at this time undertake to determine whether an award of monetary damages might later be made in this case. That issue is among the issues that might raise constitutional concerns de-

pending on circumstances yet to develop. It is among the issues not ripe for adjudication at this time.

Some confirmation of the meaning of "relief" as focusing on forms of remedies rather than being synonymous with "judgment" or "decree" appears in customary nonstatutory definitions. For example, relief is defined by the standard legal dictionary as:

> Deliverance from oppression, wrong, or injustice. In this sense it is used as a general designation of the assistance, redress, or benefit which a complainant seeks at the hands of a court, particularly in equity. It may be thus used of such remedies as specific performance, injunction, or the reformation or rescission of a contract.

*Black's Law Dictionary* 1161 (5th ed. 1979). Relief is thus defined as a type of remedy. "Remedy," in turn, is defined as "[t]he means employed to enforce a right or redress an injury, as distinguished from right, which is a well founded or acknowledged claim." *Id.* The distinction between a right or a judgment and the means employed in aid of it, suggested by these definitions, is clarified by the addition of the word "prospective," which is defined by Black's as "looking forward; contemplating the future." *Id.* Thus, ordinary usage confirms a distinction between, on the one hand, "relief" and "prospective relief" and, on the other hand, the judgment or consent decree itself.

## E. Terminating Prospective Relief, as Distinct From Vacating the Judgment

As explained above, I do not accept the proposition asserted by various parties that this case involves only injunctive relief included in a consent decree that was merely approved by the court without any other form of adjudication.

Even assuming, without deciding, that earlier interlocutory adjudications may be wiped out by a consent decree in some circumstances, this is not such a case. The initial Consent Decree recited an agreement, approved by the court, that the decree "sets forth a program which is both constitutionally adequate and constitutionally required." *See* Part I, above. Like other aspects of the Consent Decree, this provision has been modified by later orders made in conformity with the standards for modification of consent decrees prescribed by the Supreme Court. For example, more than a decade after the original decree had been entered, the court, on March 31, 1993, made the following findings: 1) that "the current sustained rise in the inmate population was not foreseen" (Memorandum and Order of March 31, 1993, at 16); 2) that "the single-bunking requirement was a significant objective of the consent decree" and that the plaintiffs would not have consented to the decree if the requirement had not been included (*id.* at 17); 3) that "double-bunking" would substantially increase the risk of violence in the cells under their current design (*id.*); 4) that "the risk of infectious diseases would be exacerbated by double-bunking" (*id.* at 18); and 5) that the Sheriff's financial constraints alone did not constitute a sufficient reason for modifying the Consent Decree to allow the Sheriff to double-bunk in 197 cells (*id.* at 19–21).

The court later found that the unforeseen increase in inmate population did warrant modification of the Consent Decree, but in doing so, the court also concluded that double-bunking in more than 100 cells would not comport with the objectives of the Consent Decree (Memorandum and Order of January 25, 1994 at 5–6). Among other reasons stated for this determination was the effect that double-bunking throughout the facility would have on all other circumstances bearing upon adequacy of health care, opportunities for reasonable exercise and recreation, and other services of the institution as a whole. The final Memorandum noted that inmate population of a magnitude requiring more extensive double-bunking might present a serious constitutional issue (Memorandum and Order of June 14, 1994 at 12). These determinations, among others, represent judicial determinations regarding the rights and duties of the parties that are distinct from the relief ordered as remedies.

## V. Distinctions Between the Statutory Interpretation Chosen and Those Urged by the Parties

The path of statutory interpretation adopted by the court, if accepted on appeal, avoids constitutional confrontation. It is a

880

path distinct from those urged by the parties. Explicitly, I do not conclude that defendants' interpretation of the PLRA's termination provisions would comport with constitutional principles. Also, however, this court has not made and does not now make the findings required under § 3626(a) or (b) to keep in force prospective relief, as plaintiffs have urged.

In its previous decisions rejecting some proposed modifications of the Consent Decree and accepting others, the court was acting before the mandate of the PLRA was enacted and, necessarily, was applying the wholly different standards defined by Fed. R.Civ.P. 60(b) and the Supreme Court's directive in *Rufo v. Inmates of the Suffolk County Jail,* 502 U.S. 367, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

■ Plaintiffs urge, in the alternative, that the court should now make the findings under § 3626(b)(2) of current or ongoing violations of a federal right and should decide that the Consent Decree, as modified, is narrowly tailored to the least intrusive means of providing a remedy for those violations. In rejecting this alternative contention I am guided by the principles of justiciability and prudential concern about unnecessarily reaching constitutional issues. At present, no evidence is before the court to support findings that defendants are not in compliance with the terms of the modified Consent Decree.

Plaintiffs argue that the only reason for the defendants' current state of compliance is the force of the Consent Decree and the threat of contempt for noncompliance. They argue that the court should make findings that noncompliance will occur if the Consent Decree is vacated, or even its provisions for prospective relief are vacated, and will lead to conditions of confinement in violation of constitutional standards. The United States urges a similarly broad interpretation of § 3626(b)(2), arguing that the finding of threatened recurrence of a constitutional violation would satisfy the statutory requirements.

■ All these arguments, however, are arguments for predictive findings about future conditions. Predictive findings would necessarily be made, even after a full evidentiary hearing, with a degree of uncertainty about whether they would turn out to be correct. The wiser course is to decline to decide the merits of such predictive contentions about threatened violations that may never occur. *Cf. Mass. Ass'n of Afro–American Police v. Boston Police Dep't,* 973 F.2d 18, 20 (1st Cir.1992) (where a dispute involves "uncertain and contingent events that may not occur as anticipated, or indeed may not occur at all," the case is not fit for review). This point is especially apt where difficult constitutional questions are at stake.

## VI. A Narrow Constitutional Ruling in the Alternative

All parties and the United States as intervenor, though they differ as to whether the relief contained in a consent decree is an element of a final judgment, and thus immune to retroactive legislative interference, have acknowledged that, under *Plaut,* Congress may not act to set aside a final judgment of an Article III court. If this court were to interpret the statute as making defendants' request the equivalent of a request to set aside the court's judgments contained in the various orders granting the prospective relief, that interpretation would present a serious constitutional issue.

■ Precisely the same order on the pending motions that is appropriate under the statutory interpretation explained in preceding parts of this opinion is also appropriate on another ground that does involve determining one aspect of plaintiffs' constitutional challenges. In order to avoid delay in final resolution of the motions now pending before this court in the event a higher court rejects the statutory interpretation proposed above, I proceed to that narrow constitutional issue.

Consider, as an example, one aspect of the Consent Decree in this case, as last modified. Before enactment of the PLRA, this court had denied defendants' requests for a modification of the Consent Decree to delete female members from the plaintiff class or in some other way allow them to be housed in conditions below the standards set in the Consent Decree.

The parties then negotiated, entirely without consultation with the court, for a temporary agreement under which female members of the plaintiff class were held in a facility in the Suffolk County Courthouse rather than the Nashua Street Jail. Later they reached an agreement for holding female members of the class elsewhere, under terms and conditions that satisfied class counsel as effecting equal treatment for the female detainees.

Had the parties not asked the court's approval, this agreement might have been determined to be what the PLRA refers to as a "private settlement agreement[ ]." The PLRA also provides, however, that a "private settlement agreement" is not enforceable in the usual way, as in a civil action for damages. Instead, the statute allows, as the only remedy for breach of a "private settlement agreement," after the effective date of the PLRA, that plaintiffs could elect to have their constitutional claims reopened and litigated under the constraints of the new Act. *See* 18 U.S.C. § 3626(g)(6).

In this instance, however, the parties reported their agreement to the court, asked the court's approval, and the court did approve the agreement as another modification of the Consent Decree.

Compare the statutory treatment of rights of inmates under a "private settlement agreement" (as defined in the PLRA) with the treatment of the adjudicated rights of members of the plaintiff class in this case, as declared in this court's Final Order of June 14, 1994:

(2) The Inmates and the Sheriff having filed a joint proposal with respect to housing female detainees, and no other party having objected at the hearing of June 14, 1994, the Sheriff's action in complete accordance with their agreement as recited below will be permitted, commencing immediately.

### AGREEMENT

A. The Sheriff shall not use the so-called "House of Detention" or the "City Prison" in the Suffolk County Courthouse to hold Suffolk County pretrial detainees.

B. If the Sheriff determines that to hold all the Suffolk County pretrial detainees committed to his custody the use of a building or buildings in Suffolk County, other than the Nashua Street Jail is required, he shall provide written notice to counsel for the inmates of that determination. Except in the case of an emergency, such notice shall be delivered to counsel for the inmates at least thirty (30) days prior to beginning use of such building or buildings. In an emergency situation the Sheriff shall provide such reasonable notice to counsel for the inmates as the circumstances permit.

C. The Sheriff may hold Suffolk County female pretrial detainees at a unit or units located at the Suffolk County House of Correction designated for that purpose. If the Sheriff does so, the cells at the Nashua Street Jail used to house Suffolk County female pretrial detainees shall be used as single occupancy cells to hold Suffolk County male pretrial detainees. Suffolk County female pretrial detainees at the Suffolk County House of Correction shall be held in twenty-six (26) cells as follows. Each of the twenty-six (26) cells shall first be assigned one occupant. After one occupant has been assigned to each of the twenty-six (26) cells, an additional Suffolk County female pretrial detainee may be assigned to twelve of the cells, such that, at a maximum, thirty-eight (38) Suffolk County female pretrial detainees are being held, fourteen (14) in single occupancy cells and twenty-four (24) in double occupancy cells. Suffolk County female pretrial detainees in excess of thirty-eight (38) shall be transferred to other facilities as provided for under Massachusetts law. Suffolk County female pretrial detainees held at the Suffolk County House of Correction shall have the benefit of all programs currently available to detainees at the Suffolk County Jail. Suffolk County female pretrial detainees held at the Suffolk County House of Correction shall also have the benefit of and shall jointly partici-

pate in those programs which are available to female prisoners at the Suffolk County House of Correction, except for pre-release and release programs for which pretrial detainees are not eligible.

In this agreement, the Sheriff undertook ongoing obligations with respect to the treatment of female members of the plaintiff class. The continued recognition of these obligations has significant practical value to these members of the class even after their entitlement to orders of specific performance is terminated. The effect of the PLRA, unless construed to preserve these obligations (as proposed in earlier sections of this opinion), would be to set aside by statutory directive a final judgment of a court. This would be the most serious intrusion on the separation of powers of any of the various alleged intrusions plaintiffs have challenged. For the same reason, it would be the strongest ground for a holding of unconstitutionality.

That holding, however, would be a narrow and limited one. All that need be held at this time, before predicted events of violations of adjudicated federal rights have occurred, is that, on constitutional grounds concerned with separation of powers, the statute not be enforced to the extent that it is interpreted as supporting defendants' contention for vacating judgment or vacating the adjudication of defendants' obligation to comply with their agreement (even though the threat of specific enforcement of orders to comply, backed up by contempt power of the court for noncompliance, is terminated).

As an alternative ground of decision, should my interpretation of the statute be rejected, I conclude that the ruling of unconstitutionality in this limited respect supports the order made below. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, ——, ——, 115 S.Ct. 1447, 1452, 1463, 131 L.Ed.2d 328 (1995) (stating the question presented in that case to be whether a section of the Securities and Exchange Act of 1934, "to the extent that it requires federal courts to reopen final judgments in private civil actions" under another section of the Act, "contravenes the Constitution's separation of powers or the Due Process Clause of the Fifth Amend-

ment," *id.* at ——, 115 S.Ct. at 1450, and answering on the "narrower ground," *id.* at ——, 115 S.Ct. at 1452, that the challenged section of the statute "is unconstitutional to the extent that it requires federal courts to reopen final judgments entered before its enactment," *id.* at ——, 115 S.Ct. at 1463).

I do not suggest that the rights of the members of the plaintiff class in this case present as clear a case for application of this principle of separation of powers as did the rights of the claimants in *Plaut,* as evaluated in the concurring opinion of Justice Breyer. *See id.* at —— ——, 115 S.Ct. at 1463–66 (Breyer, J., concurring). One reason is that, unlike the statutory provision in *Plaut, id.* ——, 115 S.Ct. at 1463, this one is not exclusively retroactive in effect. Indeed, it is mostly prospective, except as it applies to consent decrees entered before its effective date. On balance, however, I conclude that this fact does not insulate it from the narrow challenge that it offends the principle of separation of powers to the extent that it is interpreted as having retroactive effect to reopen consent decrees entered before its enactment. Also, though in less striking degree than the statutory provision at issue in *Plaut,* if interpreted to abrogate not only prospective relief but as well the underlying consensual obligations that have value even if no longer subject to enforcement by orders of specific performance, the statutory provision at issue here does lack "liberty-protecting assurances that prospectivity and greater generality," *id.* at ——, 115 S.Ct. at 1465, of a statutory mandate might have provided. To the extent that this statute is interpreted as abrogating obligations and not merely withdrawing a form of relief in aid of fulfillment of those obligations, it becomes an attempt to accomplish the desired results not "by rules of general applicability" but by "specify[ing] the people upon whom the sanction it prescribes is to be levied," *id.* at ——, 115 S.Ct. at 1464 (quoting *United States v. Brown,* 381 U.S. 437, 461, 85 S.Ct. 1707, 1721–22, 14 L.Ed.2d 484 (1965)).

### VII. Other Requests

■■■ Based on other provisions of the PLRA or on Fed.R.Civ.P. 60(b), both the Sheriff and the Commissioner make alterna-

tive arguments for the court's vacating the Consent Decree. The Sheriff argues that the court's Final Order constitutes a "prisoner release order" within the meaning of the PLRA because the order that the Sheriff may not double-bunk inmates in more than 100 cells, without first filing a motion and supporting proof, has the "effect of reducing or limiting the prison population." 18 U.S.C. § 3626(g)(4). Under the PLRA, a "prisoner release order" may be entered only by a three-judge panel after a finding by that panel that crowding is the primary cause of the violation of a federal right and that no other relief would remedy the violation. 18 U.S.C. § 3626(a)(3).

This, however, is an attempt at labeling rather than facing substantive issues on the merits. This court has not made any order for prisoner release and is not doing so now. If orders for prisoner release are sought, they are more likely to be heard and decided by courts of the Commonwealth of Massachusetts than by this court.

██ The Commissioner's argument that the Consent Decree should be vacated under Fed.R.Civ.P. 60(b) because of changed circumstances is rejected for lack of a supporting proffer sufficient to invoke the procedures available under the Final Order in this case. The Commissioner argues that the affidavits and reports filed show no increase in the incidence of assaults and disease due to the modification to allow 100 double-bunked cells. According to the Commissioner, these reports are evidence that the constitutional violation has been totally remedied. Moreover, the Commissioner argues, the defendants' good faith compliance with the Consent Decree since the opening of the Nashua Street Jail and the enactment of the PLRA also support a finding by the court of changed circumstance (changed implicitly to "good faith compliance" from some circumstance that someone at least, if not defendants, might believe to be other than "good faith compliance") that would warrant vacating the decree.

The changes in law incident to enactment of the PLRA have been fully considered and taken into account in this opinion. The Commissioner's other arguments for a finding of change of circumstance are not persuasive. The proffers of evidence fail to show a significant change in factual circumstance after the entry of the Final Order of June 14, 1994, and, as well, fail to show any attempt to tailor narrowly a proposed modification to conform with Rule 60 and the Supreme Court's guidance for precisely this case.

## VIII. Conclusion

The appealability of one or more of the decisions explained in this opinion is a matter for decision of a higher court, rather than this court. To avoid any impediment to appealability, however, by reason of the method of formal filing of this opinion, the rulings on the motions, and the resulting order, the court directs that the Clerk enter on a separate document an Order in accordance with this opinion.

## ORDER

For the reasons stated in the opinion of this date, it is ORDERED:

(1) The Motion of the Sheriff of Suffolk County to Terminate All Prospective Relief Within the Meaning of and Pursuant to 18 U.S.C. § 3626(b)(2) (Docket No. 375) is

(a) GRANTED to the extent that the obligations placed on defendants under the Consent Decree as last modified, under paragraphs (1) and (2) of the Final Order of June 14, 1994, will no longer be enforced by an order of specific performance;

(b) DENIED to the extent that it requests that the court terminate the obligations stated in the modified Consent Decree and paragraphs (1) and (2) of the Final Order of June 14, 1994, as the consensual undertakings of the defendants with court approval, and to the extent that it requests that the entire modified Consent Decree be vacated.

(2) Defendant Commissioner of Correction's Motion to Vacate Consent Decree (Docket No. 378) is DENIED, but with the clarifying provision that termination of enforcement by an order of specific perfor-

mance has been effected as stated in paragraph 1(a) of this Order.